CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

AUG 23 2005

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

DEBORAH J. HONAKER,  )
    Plaintiff,  )
      )
v.  )    Civil Action No. 1:04cv00073
      )    **MEMORANDUM OPINION**
      )
      )
**JO ANNE B. BARNHART**,  )
**Commissioner of Social Security,**  )    By:   GLEN M. WILLIAMS
    Defendant.  )    Senior United States District Judge

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

### I. Background and Standard of Review

Plaintiff, Deborah J. Honaker, ("Honaker"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Honaker's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003). Jurisdiction of this court is pursuant to 42 U.S.C.A. § 405(g) (West Supp. 2004).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

-1-

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Honaker filed her application for DIB benefits on or about February 24, 2002, alleging disability as of December 4, 2001, based on acute bronchitis, asthma, knee pain, back pain, arthritis, mini strokes, migraine headaches, diabetes, carpal tunnel syndrome, thyroid problems, high blood pressure and depression. (Record, ("R."), at 56-59.) Her application was denied initially and on reconsideration. (R. at 43-45, 48-50.) Honaker then requested a hearing before an administrative law judge, ("ALJ"). (R. at 51-52.) The ALJ held a hearing on July 7, 2003, at which Honaker was represented by counsel. (R. at 354-90.)

By decision dated August 2, 2003, the ALJ denied Honaker's claim. (R. at 17-30.) The ALJ found that Honaker met the nondisability requirements for a period of disability and was insured for DIB purposes through the date of his decision. (R. at 29.) The ALJ also found that Honaker had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 29.) The ALJ found that Honaker had an impairment or a combination of impairments considered "severe," but her impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) The ALJ found that Honaker's

Case 1:04-cv-00073-GMW-PMS   Document 16   Filed 08/23/05   Page 2 of 40   Pageid#: 70

allegations regarding her limitations were not totally credible, and that she had the residual functional capacity to perform light exertion in simple, unskilled, low-stress jobs that did not require prolonged standing or walking and did not expose her to dust, chemicals or other respiratory irritants. (R. at 29.) The ALJ found that Honaker was unable to perform any of her past relevant work and that she had no transferable skills and/or transferability of skills was not an issue in the case. (R. at 29.) Based on Honaker's age, education, past work experience and residual functional capacity, the ALJ found that there were a significant number of jobs in the national economy that Honaker could perform. (R. at 29-30.) Thus, the ALJ found that Honaker was not under a "disability," as defined in the Act, at any time through the date of his decision. (R. at 30.) *See* 20 C.F.R. § 404.1520(g) (2005).

After the ALJ issued his opinion, Honaker pursued her administrative appeals, (R. at 12-13), but the Appeals Council denied her request for review. (R. at 6-8.) Honaker then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2004). The case is before the court on Honaker's motion for summary judgment filed December 3, 2004, and the Commissioner's motion for summary judgment filed March 7, 2005.

## II. Facts

Honaker was born in 1955, (R. at 357), which classifies her as a younger person under 20 C.F.R. § 404.1563(c). Honaker graduated from high school and has an associate's degrees in accounting and information systems administration. (R. at

at 357.) Honaker has past work experience as a line assembler, a merchandising assistant, a cashier and a secretary/bookkeeper. (R. at 358-59.)

During the hearing, Honaker testified that she last worked as a line assembler for Teleflex in December 2001. (R. at 357-58.) Honaker testified that her work at Teleflex was fast-paced and at times required her to lift boxes weighing up to 30 pounds. (R. at 361.) Honaker stated that the needs of the particular job dictated whether you stood or sat while working. (R. 361.) Honaker testified that her prior positions as an office worker required her to sit at a computer and generally didn't require her to interact with the public. (R. at 360.)

Honaker testified that she fell and injured her head, back and knee while working at Teleflex and that her workers' compensation claim was still pending. (R. at 362, 383.) With regard to her injured knee, Honaker testified that she had trouble standing for long periods of time and that it would "hyper-flex" if she wasn't careful. (R. at 362-63.) Honaker stated that she had undergone one surgery on her knee and that she had been told that she might require knee replacement surgery. (R. at 363.) Honaker testified that movement caused her knee to become inflamed, and she stated that she treated the swelling by icing and elevating her knee. (R. at 364-65.)

Honaker testified that she also had trouble with her back, noting that it "locked up" at times "across the hips." (R. at 363-64.) Honaker testified that this usually occurred after she sat or stood for long periods of time. (R. at 364.) Honaker stated that she could sit for only 15 to 20 minutes at a time before the pain would force her to change positions. (R. at 364.)

-4-

Honaker next testified that she suffered from bronchitis and chronic obstructive pulmonary disease, ("COPD"). (R. at 365.) Honaker noted that she coughed a lot and got sick easily. (R. at 365.) Honaker testified that she used a nebulizer and took medication in order to treat her respiratory impairments. (R. at 365-66.) Honaker noted that she had to use the nebulizer every four or six hours and that it caused her to feel nervous and shaky and, at times, nauseated and irritable. (R. at 366- 67.) Honaker noted that her breathing treatments caused her heart to beat faster which, in turn, caused her to tire more easily. (R. at 373.) Although she had not had one in more than a year, Honaker testified that her asthma attacks were at times so severe that she would require medical attention. (R. at 366-67.) Honaker testified that she was no longer able to work around fumes and cleaning supplies. (R. at 368.)

Honaker next testified that she suffered from panic attacks and seizure-like episodes. (R. at 365, 68.) Honaker noted that these episodes could occur at any time and were generally caused by stress. (R. at 368-69.) Honaker stated that a mild episode would cause her to lose her vision and go numb on one side of her body. (R. at 369.) These episodes were often followed by migraine headaches that would last for two to three days. (R. at 369.) Honaker testified that she treated her migraines with Tylenol, Advil and Motrin. (R. at 370.) Honaker noted that it usually took one to two days to recover from a migraine and that the medication affected her concentration and made her drowsy. (R. at 370.)

When describing her paralysis, Honaker noted that she would go numb down the right side of her face and into her right shoulder and arm. (R. at 372.) Honaker noted that the paralysis lasted anywhere from a few minutes to half an hour. (R. at

-5-

372.) If the episode was serious, Honaker stated that she might have trouble speaking or understanding someone who was speaking to her. (R. at 369.) Honaker testified that these episodes would usually last from 10 to 15 minutes at a time and would usually occur six to 12 times a month. (R. at 369-70.)

Honaker next testified that she suffered from diabetes. (R. at 370.) Despite this diagnosis, however, Honaker testified that she had not yet been placed on insulin. (R. at 371.) During those times when her condition was not under control, Honaker stated that her vision would become blurred and she would become nauseated. (R. at 371.) Honaker stated that she became irritable and jittery during these times as well. (R. at 371.)

Next, Honaker testified that she had been diagnosed with carpal tunnel syndrome. (R. at 372.) Honaker noted that both of her wrists had been operated on, and that this seemed to rectify the problems. (R. at 372-73.) Honaker noted that she had trouble with her cholesterol and blood pressure as well, but these problems seemed to be regulated with medication. (R. at 374.) Honaker stated that she also had thyroid problems which caused her to become irritable. (R. at 374.)

Honaker next testified that she suffered from arthritis. (R. at 374-75.) Honaker claimed that her entire body was affected, but she specifically noted problems with her hands, back, shoulders and legs. (R. at 375.) Honaker testified that she had a history of cancer, but recent tests had all returned negative. (R. at 376.)

Honaker testified that she had suffered emotionally as a result of her

-6-

impairments because she was no longer able to lead the active life that she once had. (R. at 376.) Honaker testified that she was no longer able to work in the garden or around the house, and that she could work for about only 45 minutes before having to rest for the remainder of the day. (R. at 376-77.)

Honaker testified that she had recently done some work as a substitute teacher. (R. at 377.) Honaker testified that she worked for only one half or one full day each month. (R. at 377.) Honaker stated that it usually took her two full days to recover from one full day of substituting for younger children, and one full day to recover from substituting for older children. (R. at 377.)

Honaker testified that she had trouble sleeping at night and that she had very little energy during the day. (R. at 378.) Honaker testified that she experienced episodes of crying and anger as well. (R. at 378.) She noted that she did not participate in things like she had in the past, and that now she generally just kept to herself. (R. at 379.) Honaker stated that she had gained weight since she stopped working, and that her doctors attributed this to stress eating. (R. at 379.)

Honaker testified that she lived in a house with her husband and three grandchildren, ages seven, six and five. (R. at 379-80.) Honaker noted that the children suffered from behavioral and developmental problems and that her husband usually cared for them as she could not deal with the associated stress. (R. at 380.) Honaker testified that she did the cooking but not the cleaning. (R. at 380-81.) Honaker stated that her doctors had advised her to limit how far she drove and that she usually would have someone drive her on trips of 30 miles or more. (R. at 381.)

-7-

Honaker testified that she did her own shopping and that she went to church on occasion. (R. at 381.) Honaker noted that she was no longer able to do many of the things that she once enjoyed. (R. at 382.) Honaker testified that the pain in her hands prevented her from, sewing, gardening, quilting and working on the computer. (R. at 382.) Honaker testified that she spent most of each day at home on the couch. (R. at 382-83.) Finally, Honaker testified that she took a nap for an hour or two each day. (R. at 383.)

At Honaker's hearing, Cathy Sanders, a vocational expert, also testified. (R. at 384-88.) Sanders classified Honaker's work as an assembler as medium and unskilled and her work as a cashier as light and unskilled. (R. at 384.) Sanders classified Honaker's work as a secretary/bookkeeper as sedentary and skilled and her work as a merchandising assistant as light and skilled. (R. at 384.) In the ALJ's first hypothetical, Sanders was told to assume a person with the same age, education and past relevant work experience as Honaker. (R. at 384-85.) She was further told to assume that this person was limited to light work in simple, low-stress jobs that did not require prolonged standing or walking. (R. at 385.) Finally, Sanders was told that the individual could not be exposed to excessive dust, fumes, chemicals or temperature extremes. (R. at 385.) Sanders testified that there were 425,000 such jobs in the national economy and 3,250 such jobs in the local economy that such an individual could perform; she listed examples, such as an office assistant, an interviewer, an information clerk, a seated gate guard and a ticket clerk. (R. at 385.) Next, Sanders was told to assume an individual who had the same limitations as were mentioned in the first hypothetical, with the additional limitations noted in the psychological evaluation completed by B. Wayne Lanthorn, dated April 3, 2003. (R.

-8-

at 385-86.) Sanders stated that there would be no jobs available to an individual with those limitations. (R. at 386.)

During questioning by Honaker's attorney, Sanders was asked whether there were any jobs available for an individual with the same age, education and work experience as the claimant, who also suffered from the limitations mentioned in the report of Dr. Faisal W. Chaudry, M.D., dated April 14, 2003. (R. at 386.) Sanders stated that there would be some sedentary administrative support jobs available, but likely not in any significant numbers. (R. at 387.) Next, Sanders was told to assume the same limitations as were present in the ALJ's first hypothetical, with the additional limitation of an inability to sit for a prolonged period of time. (R. at 387.) Sanders stated that such an individual would not be able to work as an office or ticket clerk. (R. at 388.) Next, Sanders was asked whether the individual would still be able to perform the aforementioned jobs if she required breathing treatments during the workday. (R. at 388.) Sanders testified that the individual would no longer be capable of performing the jobs she had mentioned previously. (R. at 388.) Next, Sanders was asked whether the individual would be capable of performing those jobs if she had to lie down for one or two hours during a typical eight-hour workday. (R. at 388.) Sanders testified that she would not. (R. at 388.) Finally, Sanders was asked whether the individual would be capable of performing those jobs if she had no useful ability to demonstrate reliability in terms of showing up to work. (R. at 388.) Again, Sanders testified that she would not. (R. at 388.)

In rendering his decision, the ALJ reviewed medical records from Appalachian Orthopedic Associates; Russell County Medical Center; Blue Ridge Occupational

Case 1:04-cv-00073-GMW-PMS   Document 16   Filed 08/23/05   Page 9 of 40   Pageid#: 77

Health; Dr. Francisco Caycedo, M.D.; Clinch Valley Medical Center; Marta Prupas, F.N.P.; Richard G. Salamone, Ph.D.; John J. Dreyzehner, M.D.; Dr. Jey Maran, M.D.; Dr. Mark D. Russ, M.D.; Bristol Regional Medical Center; Dr. German Iosif, M.D.; Dr. Richard M. Surrosco, M.D., a state agency physician; R. J. Milan Jr., Ph.D., a state agency psychologist; B. Wayne Lanthorne, Ph.D.; Dr. Faisal T. Chaudry, M.D.; Mountain Empire Neurological Associates; and Dr. Renee Mason, D.P.M.

On March 11, 1998, Honaker was admitted to Clinch Valley Medical Center complaining of shortness of breath, cough with production of phlegm, recent right-sided pleurisy, fever and chills. (R. at 334-37.) Dr. Faisal T. Chaudhry, M.D., noted that Honaker had been treated a few days earlier for a respiratory tract illness and that she was not responding to oral antibiotic therapy. (R. at 335.) A physical exam revealed a congested throat, cervical lymphadenopathy and crackling and wheezing in the lungs. (R. at 336.) Honaker was placed on antibiotics and received Albuterol aerosol treatments for bronchodialation, Lipitor for hyperlipidemia, Premarin for postmenopausal estrogen replacement therapy and Guaifenesin SR, Zantac and Propulsid for mucolytic agents and chronic gastritis. (R. at 334.) Honaker gradually responded and her pulse oximetryimetry improved to 95 percent saturation on room air. (R. at 334.) Honaker was discharged in stable condition on March 14, 1998. (R. at 334.) Upon discharge, Dr. Chaudhry diagnosed Honaker with acute pneumonitis, mild dehydration and hyperlipidemia. (R. at 334.) Dr. Chadhry prescribed Levaquin, Guaifenesin SR, Claitin and Phenergan, and advised Honaker to follow a low cholesterol diet . (R. at 334.)

On August 24, August 28 and September 11, 1998, Honaker saw Dr. Renee

Mason, D.P.M., of the Abingdon Foot & Ankle Clinic regarding a wart on her foot and several ingrown toenails. (R. at 325-27.) The wart and toenails were removed and no further problems were noted. (R. at 325-27.)

On June 10, 1999, Honaker began treatment at Appalachian Orthopaedic Associates, ("AOA"), for pain in her shoulders, back, forearms, legs and feet. (R. at 118-20.) Honaker stated that the pain in her shoulders had begun two years earlier and was aggravated by walking and reaching overhead. (R. at 120.) Although the pain had resulted in some mild limitations, it had not forced her to miss any work at that time. (R. at 120.) Honaker stated that standing aggravated her back, and that driving and sleeping caused pain in her forearms and hands. (R. at 120.) Honaker noted occasional swelling in her legs and arms but denied experiencing chest pain, shortness of breath or dizzy spells. (R. at 119.) Finally, Honaker noted numbness, tingling, weakness and occasional burning and shocking sensations in her arms and legs (R. at 119.)

Upon physical examination, Dr. Bert E. Tagert, M.D., described Honaker as a well-developed, well-nourished, moderately overweight, middle-aged female in no acute distress. (R. at 119.) Examination of Honaker's cervical and lumbar spine revealed normal range of motion. (R. at 119.) Dr. Tagert noted that Honaker's right trapezious muscle, her right levator scapulae, her parascapular border and both AC joints were tender to palpatation. (R. at 119.) Dr. Tagert noted that Honaker exhibited some pain with flexion elevation and cross chest maneuvers, bilaterally. (R. at 119.) Although a physical examination revealed some tenderness in Honaker's shoulders, no instability or atrophy was noted. (R. at 119.) Sensory/motor/reflex examinations

-11-

appeared to be intact in both the upper and lower extremities. (R. at 119.) Straight leg raises were negative, both seated and supine, and knee and ankle jerks were two-plus and symmetric. (R. at 119.) Examination of the left upper extremity revealed tenderness distal to the lateral epicondylar region of the left elbow. (R. at 118.) Dr. Tagert noted that Honaker exhibited pain upon extension and supination against resistance. (R. at 118.) Dr. Tagert noted no tenderness over the lateral epicondyle, but did find that Honaker was tender over the posterior interosseous nerve eight to 10 centimeters distal to the epicondyle. (R. at 118.) X-rays of Honaker's elbow were negative, but films of her right shoulder revealed a mild anterior acromial spur indicating a Type II acromion. (R. at 118.)

Dr. Tagert's impressions were impingement of the right shoulder, possible posterior interosseous nerve entrapment of the left elbow and lumbar pain. (R. at 118.) Dr. Tagert recommended that Honaker be evaluated at outpatient physical therapy for instructions on exercises for her shoulder, elbow and lumbar spine. (R. at 118.) Dr. Tagert prescribed Honaker an anti-inflammatory drug, instructed her to continue her exercises and asked her to return in six weeks. (R. at 118.)

On July 30, 1999, Honaker returned to Dr. Tagert for a follow-up exam. (R. at 116-17.) Although Honaker continued to complain of pain in her shoulder and elbow, she stated that her back was now causing her the most trouble. (R. at 117.) Dr. Tagert noted that Honaker's back pain had been evaluated earlier and, other than degenerative disc disease, no specific pathology had been found. (R. at 117.) Dr. Tagert further noted that Honaker's pain did not appear to follow any specific pattern. (R. at 117.)

-12-

Upon physical examination, Honaker exhibited pain in her right shoulder with flexion/elevation impingement signs and with 90 degree abuduction/internal rotation. (R. at 117.) Honakers' shoulder strength seemed to be well preserved and examination of the left elbow revealed tenderness distal to the lateral epicondylar region. (R. at 117.) Dr. Tagert noted that Honaker experienced pain upon extension of her wrist and long finger against resistance. (R. at 117.) Otherwise, Dr. Tagert noted, Honaker appeared to be neurologically intact. (R. at 117.)

Examination of Honaker's back revealed diffuse lumbosacral tenderness. (R. at 117.) Seated and supine straight leg raises were essentially negative for radicular pain but did produce some back pain. (R. at 117.) Sensory/motor/reflex examinations were normal. (R. at 117.) A review of an MRI of Honaker's lumbar spine taken February 27, 1997, revealed mild central degenerative disc bulging at L4-L5, with no other significant pathology noted. (R. at 117.) Dr. Tagert's impressions were lumbar pain, probably secondary to degenerative disc disease, right shoulder impingement and possible posterior interosseous nerve entrapment of the left elbow. (R. at 117.) Honaker underwent a panel of blood tests and received prescriptions for Pamelor and Vioxemetryx. (R. at 116-117.)

On September 24, 1999, Honaker returned to Dr. Tagert for a follow-up exam. (R. at 115-16.) Dr. Tagert noted that the results of Honaker's lab work were essentially unremarkable. (R. at 116.) Honaker reported that her symptoms had improved on Vioximetryx. (R. at 116.) Honaker noted that, although the pain in her shoulder, elbow and back had improved, she now experienced pain in the lateral aspect of her right elbow. (R. at 116.) Upon physical examination, Dr. Tagert noted

-13-

that Honaker was neurologically intact in the lower extremities. (R. at 116.) Examination of the right upper extremities was negative for flexion/elevation impingement. (R. at 116.) Honaker's shoulder strength was good but the right elbow was tender over the lateral epicondylar region, and Honaker experienced pain upon extension and supination against resistance. (R. at 116.) Honaker experienced no pain upon pronation and flexion of the wrist against resistance. (R. at 116.) Dr. Tagert noted that there were no localized areas of pain in the left elbow at that time. (R. at 116.) Dr. Tagert's impressions were lateral epicondylitis of the right elbow, somewhat improved shoulder impingement and stable lumbar pain. (R. at 115-16.) Dr. Tagert concluded that Honaker's condition had stabilized and continued her medication. (R. at 115.) Dr. Tagert instructed Honaker to return if the pain in her elbow increased, otherwise she was to return in four months for a follow-up exam. (R. at 115.)

On December 12, 1999, Honaker was admitted to Clinch Valley Medical Center complaining of diarrhea, dizziness, febrile illness and hypertension. (R. at 328-333.) A physical exam was unremarkable, and x-rays of her chest revealed evidence of old granulomatous disease. (R. at 330-31, 333.) Honaker was held overnight and discharged the following day. (R. at 328.) Dr. Chadhry's diagnosis upon discharge was acute clinical dehydration; acute influenza infection, stable; hyperlipedemia; hypertension, stable; and acute diarrhea, improving, possible viral etiology with viral gastoenteritis. (R. at 328.) Dr. Chaudhry prescribed Flumadine, Imodium, Prevacid, Premarin and Lipitor and scheduled Honaker for a follow-up exam the following week. (R. at 328-29.)

-14-

On May 12, 2000, Honaker was admitted to the emergency room at Russell County Medical Center after injuring her knee at work the previous day. (R. at 124-31.) Honaker was diagnosed with a sprained knee and received Motrin samples and an Ace bandage. (R. at 124-26, 130.)

The record indicates that Dr. John J. Dreyzehner, M.D., treated Honaker for her right knee pain from May 2000 through June 2001. (R. at 132-66.) His examinations show intermittent tenderness, decreased range of motion, mild effusion, positive McMurray's testing and negative Lachman's and drawer testing. (R. at 132-66.) Dr. Dreyzehner diagnosed a right knee sprain, prescribed medications and recommended physical therapy. (R. at 132-66.)

On October 5, 2000, Honaker saw Dr. Francisco Caycedo, M.D., for treatment of her May 11, 2000, on-the-job injury. (R. at 167.) Honaker stated that the pain in her knee had increased since she began physical therapy, but she no longer experienced the "giving way" or "locking" sensations that were present after she injured her knee. (R. at 167.) Dr. Caycedo noted that Honaker's gait was not antalgic and that she had a positive sag test with a positive posterior drawer. (R. at 167.) Dr. Caycedo noted that Honaker had a mild knee effusion and that she was tender in the bursa of the pes anserine. (R. at 167.) Dr. Caycedo noted that Honaker was going to try to return to work. (R. at 167.) He recommended that Honaker continue with her physical therapy and gave her a Celestone injection to reduce the swelling. (R. at 167.)

On November 7, 2000, Honaker underwent a colonoscopy and

-15-

esophagogastroduodenoscopy, ("EGD"), at Clinch Valley Medical Center. (R. at 168-77.) The doctor's postoperative diagnosis was mild diverticulosis of the sigmoid and descending colon. (R. at 171.) Biopsies collected during the procedure were negative for dysplasia and malignancy, and the EGD revealed mild duodenitis. (R. at 169-73.)

On February 6, 2001, Honaker returned to Dr. Chaudhry's office for treatment of a sore throat, nausea, headaches, fever and chills. (R. at 218.) Upon physical examination, Carol A. Looney, F.N.P., noted that Honaker's pharynx was congested and that she had bilateral cervical lymphadenopathy. (R. at 218.) A strep screen was positive, and Looney's assessment was acute strep pharyngitis and acute upper respiratory infection. (R. at 218.) Looney prescribed Augmentin and Medent LD. (R. at 218.)

On June 5, 2001, Honaker was referred to Richard G. Salamone, Ph.D., in order to assess her candidacy for knee surgery. (R. at 226.) The report, however, is incomplete.

On June 16, 2001, Honaker was admitted to the emergency department at Clinch Valley Medical Center complaining of a rash on her neck and chest. (R. at 227-29.) The attending physician diagnosed Honaker with anxiety and an allergic reaction stemming from her hormone replacement therapy. (R. at 228.) Honaker received a prescription for Zyrtec and was told to discontinue her hormone replacement therapy. (R. at 228.) On June 18, 2001, Honaker returned to Dr. Chaudhry for treatment of her rash. (R. at 217.) A physical exam revealed a generalized macular papular pleuritic rash. (R. at 217.) Dr. Chaudhry's assessment

-16-

was contact dermatitis, hypothyroidism and a right knee injury. (R. at 217.) Dr. Chaudhry prescribed Decadron and Prednisone and ordered TSH and LFT samples to be drawn. (R. at 217.)

On June 19, 2001, Honaker saw Dr. Dreyzehner regarding increased pain in her knee. (R. at 232-33.) Honaker claimed that the pain was so severe that she was forced to drop out of her computer classes and stop driving. (R. at 232-33.) Despite earlier allegations to the contrary, Honaker did note that the topical gel she received had been helpful in alleviating the pain. (R. at 233.) Honaker also requested that Dr. Dreyzehner excuse her from work. (R. at 233.) A physical examination was unremarkable, and Dr. Dreyzehner noted that Honaker's pulse of 76 beats per minute was not consistent with her claims of extreme pain. (R. at 233.) Although Honaker complained of tenderness medially from the femoral to the tibial condyle, there was no appreciable warmth, swelling or skin changes associated with the pain. (R. at 233.) Dr. Dreyzehner's assessment was a right knee contusion overlying chondromalacia with chronic knee pain and perception of instability. (R. at 233.) In describing his plan for treatment, Dr. Dreyzehner noted that:

> In my opinion at this time, there is no physiologic evidence of an extremis of pain nor any objective examination findings that would support this. . . . I have certainly gone as far as I can go with her care and I unfortunately have nothing further to offer her. I cannot appreciate a definitive etiology for her present symptoms, particularly the extremis of which she currently complains. I do, however, feel that due to her persistent complaints, an arthroscopic diagnosis is indicated. An arthrogram could also be considered. I will at this point disengage from her care.

-17-

(R. at 233.)

On June 28, 2001, Honaker returned to AOA for treatment of her May 11, 2000, on-the-job injury. (R. at 108-114.) Subsequent to the injury, Honaker claimed that her right knee locked in a bent position and went numb from her mid thigh distally. (R. at 112.) Honaker claimed that she was unable to straighten or bend her knee for a month following the accident. (R. at 112.) Dr. Neal A. Jewell, M.D., noted that Honaker was seen in the emergency department on the date of the injury and was diagnosed with a sprain and given an Ace bandage. (R. at 112.) Honaker stated that her current symptoms consisted of chronic medial pain in the right knee with intermittent, sharp anterior pain. (R. at 111.) Honaker described a "jumping" sensation beneath her kneecap and stated that her knee was often swollen. (R. at 111.) Honaker noted that her knee was no longer locking up, but stated that she did experience a "giving way" sensation and intermittent crepitus. (R. at 111.) Honaker stated that the pain increased with standing, walking, lifting, driving, climbing stairs and performing household chores. (R. at 111.) Honaker stated that she could no longer squat, kneel or drive. (R. at 111.) Finally, Honaker stated that she felt that the pain had gotten worse over time. (R. at 111.)

Upon physical examination, Dr. Jewell noted that Honaker walked with a slight, nonantalgic limp and exhibited a hyperextension kick beginning mid-stance and continuing through the end of the stance phase. (R. at 110.) Dr. Jewell noted that Honaker could perform 80 to 90 percent of a normal squat and could hop despite some complaints of pain in the right knee. (R. at 110.) Dr. Jewell noted that Honaker's right knee exhibited no increased temperature, effusion or swelling. (R. at

-18-

110.) The exam revealed 10 degrees of hyperextension, one-plus anterior cruciate ligagment laxity and slight patellofemoral crepitus without pain. (R. at 110.) Medial collateral and lateral collateral ligament stability was good, and McMurray's test was negative. (R. at 110.) Honaker exhibited variable lateral joint line tenderness, but not when palpated in the figure four position. (R. at 110.) Honaker's exhibited fairly constant one to two-plus mid to posteromedial joint line tenderness. (R. at 110.) Dr. Jewell noted that Honaker's left knee exhibited 10 degrees of hyperextension, a normal temperature, stable ligaments and an infrequent patellofemoral click. (R. at 110.) Finally, Dr. Jewell noted that both knees showed a slightly increased Q angle. (R. at 110.)

Dr. Jewell's impressions were a sprain to the right knee, a partial tear of the posterior cruciate ligament and residual mild anterior/posterior laxity, a possible posterior horn tear of the right medial meniscus and patellofemoral arthritis of the right knee, minimally symptomatic. (R. at 109.) Dr. Jewell concluded that Honaker should be able to return to work as long as she primarily worked from the sitting position and limited herself to mild walking activities. (R. at 109.) Dr. Jewell noted that Honaker did not need to elevate or ice her knee at work and that she was capable of walking for short distances and standing for short periods of time. (R. at 109.) Dr. Jewell noted that Honaker should avoid crawling, squatting, kneeling, climbing and unprotected heights. (R. at 109.) Dr. Jewell noted that wearing a knee brace would be optional and encouraged her to work agressively on continuing her knee exercise program. (R. at 109.) Dr. Jewell continued Honaker's medication and scheduled her for a follow-up exam. (R. at 109.) Finally, Dr. Jewell noted that arthroscopic surgery could possibly improve her situation but decided to postpone a determination of

-19-

maximum medical improvement pending re-evaluation and discussion following treatment. (R. at 108-09.)

On July 3, 2001, Honaker returned to Dr. Chaudhry complaining of significant pain, swelling and instability in her knee. (R. at 216.) Honaker claimed that her knee "gave out" when she stood and extended her leg. (R. at 216.) A physical exam revealed right knee tenderness, slight posterior movement of the knee with possible weakening of the posterior cruciate ligament, but no edema. (R. at 216.) Dr. Chaudhry's assessment was knee pain, gastroesophogeal reflux disease, ("GERD"), and hyperlipidemia. (R. at 216.) Dr. Chaudry continued Honaker's medication and scheduled her for an MRI of the right knee to evaluate the posterior cruciate ligament and patellar tendon. (R. at 216.) An MRI conducted on July 5, 2001, at Johnston Memorial Hospital revealed a normal right knee. (R. At 221.)

On July 14, 2001, Honaker returned to Dr. Chaudhry complaining of continued pain in her right knee. (R. at 215.) A physical exam revealed right knee tenderness but no significant instability. (R. at 215.) Dr. Chaudhry's assessment was a knee injury and hypothyroidism. (R. at 215.) Dr. Chaudhry gave Honaker a prescription for Vioximetryx, continued her synthroid therapy and ordered her a knee brace. (R. at 215.)

Beginning July 19, 2001, the record indicates that Dr. Chaudhry treated Honaker on multiple occasions for generalized complaints of cough and congestion. (R. at 180, 182-85, 189, 192, 196, 199, 201-02, 205-07, 210-11, 213-14.) During these visits, Dr. Chaudhry diagnosed Honaker with acute bronchitis, acute pharingitis,

-20-

acute sinusitis, dyspnea, pleurisy, chronic obstructive pulmonary disorder, ("COPD"), osteopenia and dysuria. (R. at 180, 182-85, 189, 192, 196, 199, 201-02, 205-07, 210-11, 213-14.) Honaker received prescriptions for Levaquin, Medent DM, Flovent, Proventil, Himi-Bid LA, Singulair, Cefzil, Bidex, Advair, Anaplex HD, Nasacort AQ, Mucomist, Aveloximetry, Clarinex and Vibramycin, and also was instructed to undergo nebulizer treatments. (R. at 180, 182-85, 189, 192, 196, 199, 201-02, 205-07, 210-11, 213-14.)

On July 23, 2001, Honaker was seen at the Honaker Family Health Clinic on complaints of congestion, cough, wheezing, fever, nausea, diarrhea, a sore throat and decreased hearing. (R. at 236.) A physical exam revealed erythematous, midline uvula and decreased breath sounds with expiratory wheezing. (R. at 236.) Honaker was diagnosed with an acute exacerbation of her COPD and prescribed Levaquin, Medent and Medrol. (R. at 236.) Honaker was told to return for a follow-up exam in one week or sooner if needed. (R. at 236.)

On July 25, 2001, Honaker returned to the Honaker Family Health Clinic complaining of increased shortness of breath, wheezing and feelings of tightness in her chest. (R. at 235.) A physical exam revealed decreased breath sounds bilaterally with poor air exchange. (R. at 235.) Honaker was diagnosed with an acute exacerbation of her COPD and acute bronchitis. (R. at 235.)

That same day, Honaker was admitted to Russel County Medical Center on complaints of shortness of breath and increasing weakness. (R. at 238-40.) Dr. Jey Maran, M.D., noted that Honaker began smoking when she was five years old and

-21-

had smoked one and a half to two packs of cigarettes a day for the preceding 40 years. (R. at 239.) A physical exam revealed shortness of breath, an oxygen saturation of 96 percent on room air and a respiratory rate of 30. (R. at 239-40.) A cardiac exam revealed a regular heart S1 and S2 with no added sounds. (R. at 240.) Honaker's lungs revealed bilateral reduced air entry and bilateral extensive wheezing and crackles. (R. at 240.) No bronchial breathing or evidence of consolidation was noted, but Dr. Maran did find that Honaker was using accessory muscles for respiration. (R. at 240.) Dr. Maran agreed that Honaker should be hospitalized and, upon admittance, Honaker was treated with steroids, Diflucan and intravenous antibiotics. (R. at 238, 240.) By July 30, 2001, Honaker had improved significantly and was discharged. (R. at 238.) Honaker's diagnosis upon discharge was acute bacterial exacerbation of COPD, high probability of asthma with extremely increased reactivity of the airways and a history of hyperlipidemia, hypothyroidism and chronic smoking. (R. at 238.) Dr. Maran prescribed Diflucan, Levaquin and Prednisone and advised Honaker to continue using her Combivent inhaler. (R. at 238.) Dr. Maran further advised Honaker to continue using Lipitor, Synthroid and Dicoderm CQ in order to help her stop smoking. (R. at 238.)

On August 6, 2001, Honaker returned to the Honaker Family Health Center for a follow-up exam. (R. at 234.) A physical exam was unremarkable, and Honaker stated that she felt much better. (R. at 234.) Dr. Maran instructed Honaker to finish her Prednisone, prescribed Advair and cleared Honaker to return to work. (R. at 234.) Finally, Dr. Maran ordered a steady-state pulmonary function test with bronchial dilators. (R. at 234.)

On August 9, 2001, Honaker returned to AOA for a follow-up exam. (R. at 107-08.) Dr. Jewell noted that Honaker had worked only one shift since her last visit in June. (R. at 108.) Honaker claimed to have experienced a significant increase in pain even though she was required to work from only the sitting position. (R. at 108.) Honaker complained of persistent pain and swelling in her right knee but reported no new instances where it had "locked up."(R. at 108.) Honaker further complained that her knee would "give way" if she wasn't careful. (R. at 108.) Dr. Jewell noted that McMurry's test produced some slight pain and crepitus. (R. at 108.) Otherwise, however, the exam was stable and unchanging. (R. at 108.) X-rays of the knee and tibia revealed no evidence of injury in the area of the proximetryimal tibial shaft or pre-tibial region. (R. at 108.) Dr. Jewell noted that Honaker wanted to undergo arthroscopic surgery so that they might determine whether there was any possibility of improvement. (R. at 108.) Because Honaker had recently been hospitalized for bronchitis, Dr. Jewell instructed her to confer with her family physician on the advisability of surgery at that time. (R. at 107-08.)

On August 16, 2001, Honaker returned to Dr. Chaudhry for treatment of a rash that had appeared on her hands and face. (R. at 212.) Dr. Chaudhry noted that Honaker continued to complain of intermittent episodes of shortness of breath and difficulty breathing, but Honaker stated that she had not had any significant episodes of cough or congestion. (R. at 212.) A physical exam was unremarkable, and Dr. Chaudhry's assessment was a drug reaction, acute bronchitis and contact dermatitis. (R. at 212.) Dr. Chaudhry prescribed Decadron, Advair and Proventil and ordered a complete blood count and pulse oximetry test. (R. at 212.) Finally, Dr. Chaudhry discontinued Honaker's prescriptions for Singulair, Bidex and Vioxx. (R. at 212.)

-23-

On August 24, 2001, Honaker returned to Dr. Chaudhry complaining of her recent weight gain. (R. at 209.) Dr. Chaudhry noted that Honaker had been diagnosed with hypothyroidism and that she complained of mild dyspnea on exertion and at night. (R. at 209.) A physical exam was unremarkable except for bilateral expiratory ronchi and Dr. Chaudhry's assessment was weight gain, hypothyroidism and dyspnea. (R. at 209.) Dr. Chaudhry restarted Honaker on Synthroid and ordered a BMP drawn so as to rule out renal dysfunction. (R. at 209.)

On September 8, 2001, Honaker returned to Dr. Chaudhry complaining of intermittent episodes of cough and congestion. (R. at 208.) Dr. Chaudhry noted that Honaker was seeking a third opinion regarding her knee pain. (R. at 208.) A physical exam was unremarkable except for bilateral expiratory bronchi. (R. at 208.) Dr. Chaudhry's assessment was hypothyroidism, weight gain and cardiac murmur/abnormal heart sound. (R. at 208.) Dr. Chaudhry noted that a TSH had been drawn to evaluate Honaker's hypothyroidism and a pulse oximetry test revealed 97 percent saturation on room air. (R. at 208.)

On September 11, 2001, Honaker saw Dr. Jose M. Piriz, M.D., of The Clinic for an echocardiogram. (R. at 219-20.) The tests revealed some trivial mitral and tricuspid regurgitation, but otherwise, Dr. Piriz noted, the echocardiogram was normal. (R. at 220.)

On September 13, 2001, Honaker saw Dr. Mark D. Russ, M.D., P.C., an orthopedic surgeon, for an evaluation of her knee pain. (R. at 241-42.) Dr. Russ noted that an examination of Honaker's right knee revealed slight effusion, a positive

-24-

posterior drawer test and tenderness to palpitation in the region of the PES anserinus with slight swelling. (R. at 241.) X-rays of Honaker's right knee were within normal limits and revealed no severe degenerative changes. (R. at 241.) Dr. Russ's impression was laxity of the posterior cruciate ligament. (R. at 241.) Dr. Russ noted that he agreed with Dr. Caycedo's previous findings regarding Honaker's legamentous laxity and recommended that she continue wearing a knee brace. (R. at 242.) Dr. Russ concluded that Honaker would not require knee replacement surgery and stated that she should continue treating the knee symptomatically with ice and anti-inflammatory medication. (R. at 242.)

On October 12, 2001, Honaker returned to AOA for a follow-up exam. (R. at 106-07.) Dr. Jewell noted that Honaker continued to complain of medial knee pain which normally occurred while driving, walking or traversing stairs. (R. at 107.) Dr. Jewell noted that Honaker's general medical conditions had resolved and that she had been cleared for surgery. (R. at 107.) Dr. Jewell went on to note, however, that the pain in Honaker's knee had largely subsided and her family physician had cleared her to return to work. (R. at 107.) A physical examination revealed that Honaker walked with a normal gait and exhibited two-plus tenderness over the anserine insertion with minimal medial joint line tenderness. (R. at 106-07.) Honaker exhibited good range of motion of the knee with no effusion. (R. at 106.) McMurray's test produced a slight discomfort at the extremes of flexion with rotation. (R. at 106.) Dr. Jewell noted that Honaker's knee was not locking and found her calf to be soft and her distal circulation intact. (R. at 106.) Dr. Jewell gave Honaker an injection of Betamethasone and Xylocaine and recommended that she postpone surgery until after they saw how her knee reacted upon her return to work. (R. at 106.)

-25-

On October 22, 2001, Honaker returned to Dr. Chaudhry's office on a follow-up to her thyroid condition. (R. at 204.) A physical exam was unremarkable, and the attending nurse ordered a TSH and a fasting lipid panel. (R. at 204.)

On November 13, 2001, Honaker was seen in the emergency department at Russell County Medical Center. (R. at 243-46.) Honaker noted that she had experienced increased pain in her right knee after climbing stairs at work the previous night. (R. at 243-44.) Honaker rated her pain as a 10 on a scale from one to 10. (R. at 244, 245.) Honaker was diagnosed with knee pain and received a prescription for Ultram. (R. at 243.)

On November 15, 2001, Honaker returned to AOA for a follow-up exam. (R. at 105.) Honaker stated that she had not been able to work a full shift upon returning to work because she was required to frequently get up and move around. (R. at 105.) Honaker stated that the Betamethasone and Xylocaine injection helped for about a week, but the pain had continued to increase upon her return to work. (R. at 105.) Upon physical examination, Dr. Jewell noted that Honaker limped on the right side, exhibited two-plus medial joint line tenderness, two-plus pes tenderness and one-plus medial femoral condylar tenderness. (R. at 105.) Dr. Jewell noted no effusion or swelling, but McMurray's test produced a slight lateral joint line click without pain. (R. at 105.) Dr. Jewell noted that Honaker's ligaments were stable, that her bone alignment was good, that her calf was soft and her neurocirculatory status was intact distally. (R. at 105.) Except for the tenderness, Dr. Jewell noted that the examination was benign. (R. at 105.) Dr. Jewell scheduled Honaker for arthroscopic surgery of the right knee and released her to limited work which would require Honaker to stand

-26-

no more than 15 minutes every hour. (R. at 105.)

On December 4, 2001, Honaker returned to Dr. Chaudhry for a follow-up to her right knee pain, chronic bronchitis and high blood sugar level. (R. at 203.) Honaker complained of intermittent episodes of cough and congestion with production of sputum. (R. at 203.) A physical exam revealed bilateral expiratory rhonchi with coarse crackling. (R. at 203.) Dr. Chaudhry's assessment was hyperglycemia, chronic bronchitis and a right knee injury. (R. at 203.) Honaker's glycated hemoglobin was at 6.3 percent, her blood sugar level was at 83 milligrams and a pulse oximetry test revealed 95 percent saturation on room air. (R. at 203.) Dr. Chaudhry prescribed Singulair, Advair, Albuterol and Humi-Bid LA. (R. at 203.)

On December 5, 2001, Honaker underwent arthroscopic surgery of her right knee at Wellmont Bristol Regional Medical Center. (R. at 247-48.) The procedure revealed that Honaker's anterior cruciate ligament, medial meniscus, lateral compartment and patellar femoral compartment were all within normal limits. (R. at 247.) Dr. Jewell noted that there was no anterior or posterior drawer sign of note. (R. at 247.) Dr. Jewell noted that the articular surfaces of the medial compartment were normal except for a few small areas of mild grade-one to grade-two degenerative changes on the notch aspect of the medial femoral condyle. (R. at 247.) Dr. Jewell noted, however, that these changes were not likely contributors to Honaker's symptoms of pain. (R. at 247.) Dr. Jewell noted significant plica superior medially, but stated that there was no evidence that it was symptomatic. (R. at 247.) Finally, Dr. Jewell noted that there was some mild hypertrophy of the superior aspect fat pad. (R. at 247.) Dr. Jewell observed no inflammation, swelling or wear changes about

-27-

the medial aspect of the patellar or femoral groove. (R. at 247.) Dr. Jewell concluded that the surgery revealed no findings which would explain Honaker's persistent chronic symptoms. (R. at 247.) Honaker was discharged and instructed to ice and elevate the knee and walk as tolerated. (R. at 248.) Honaker received prescriptions for Celebrex and Percocet and was instructed to return in 10 to 14 days for a postoperative exam. (R. at 248.)

On December 17, 2001, Honaker returned to AOA for a follow-up exam. (R. at 104.) Dr. Jewell noted that the etiology of Honaker's knee pain was still unclear. (R. at 104.) Other than a possible symptomatic superior medial and a thickened fat pad, Honaker's cartilage and joint surfaces appeared normal. (R. at 104.) Despite these findings, Dr. Jewell noted that Honaker was still using her crutches and continued to allege that she was suffering "tremendous pain" in her knee. (R. at 104.) Upon physical examination, Dr. Jewell noted that Honaker's wounds were clean, dry and well-healed. (R. at 104.) Dr. Jewell noted no effusion, swelling, increased redness or warmth. (R. at 104.) Dr. Jewell noted that Honaker had a full range of motion and the movement of her knee was not guarded. (R. at 104.) Honaker's ligaments were stable, her bone alignment was good and her calf was soft. (R. at 104.) Dr. Jewell concluded that the examination was basically benign. (R. at 104.) Dr. Jewell further noted that, despite Honaker's complaints of extreme pain, she was not taking her prescription for Percocet. (R. at 104.) Dr. Jewell prescribed Celebrex and referred Honaker for physical therapy. (R. at 104.) Based upon the normal arthroscopic findings, Dr. Jewell opined that Honaker would eventually be able to return to unrestricted work. (R. at 104.)

-28-

On December 31, 2001, Honaker returned to Dr. Chaudhry's office for a follow-up to her bronchitis. (R. at 200.) Although Honaker noted that she was doing better, she was now concerned about a nodule that had appeared under her left arm. (R. at 200.) A physical exam was unremarkable and a pulse oximetry test revealed 98 percent saturation on room air. (R. at 200.) Honaker was scheduled for a mammogram and instructed to complete her antibiotics. (R. at 200.)

On January 11, 2002, Honaker returned to AOA for a follow-up exam. (R. at 102-03.) Dr. Jewell noted that Honaker complained of diffuse aching and tightening upon flexion of the knee. (R. at 103.) Honaker stated that she was keeping up with her exercises and a physical therapy report indicated that she had made good improvement with progressive range of motion and decreased symptoms. (R. at 103.) Upon physical examination, Dr. Jewell noted that Honaker had full range of motion in the right knee. (R. at 103.) No effusion, increased swelling, increased warmth or tenderness was noted. (R. at 103.) Dr. Jewell noted that Honaker's arthroscopy was essentially normal and failed to reveal any significant abnormality. (R. at 103.) Dr. Jewell prescribed Voltaren for Honaker's pain and released her for work effective January 14, 2002, with the limitation that she not stand for more than one hour at a time or a total of six hours in an eight-hour day. (R. at 103.) Dr. Jewell further noted that Honaker was not to lift or carry items weighing more than 25 pounds. (R. at 103.) Finally, Dr. Jewell opined that Honaker had reached the point of maximum medical improvement. (R. at 103.)

On February 1, 2002, Honaker returned to Dr. Chaudhry regarding her underlying bronchitis and bronchospasms. (R. at 198.) Honaker noted that she

-29-

experienced chest tightness and dyspnea upon minimal exertion. (R. at 198.) Dr. Chaudhry noted that a PFT test revealed no significant obstructions and a pulse oximetry test showed 98 percent saturation on room air. (R. at 198.) An EKG revealed poor R wave progression in the septal leads. (R. at 198.) A physical exam revealed bilateral expiratory rhonchi, and Dr. Chaudhry diagnosed dyspnea, COPD, chest pains and palpitations. (R. at 198.) Dr. Chaudhry continued Honaker's medications and ordered a 24-hour holter monitoring period and a persantine cardiolith test. (R. at 198.)

On February 5, 2002, Honaker underwent an open excision biopsy at Clinch Valley Medical Center in order to remove a mass from her left breast. (R. at 339-40.) The mass was removed and sent to the lab for a histopath evaluation. (R. at 340.)

On February 8, 2002, Honaker returned to AOA for a follow-up exam. (R. at 102.) Honaker continued to complain of persistent pain and a "giving way" sensation in her knee. (R. at 102.) Although Honaker claimed to perform her exercises daily, Dr. Jewell noted that she had a difficult time remembering how to do them. (R. at 102.) During a physical exam, Honaker was able to walk with a normal gait and perform a full squat without evidence of pain. (R. at 102.) Honaker's ligaments were stable, and she exhibited a full range of motion in both knees. (R. at 102.) Dr. Jewell noted that Honaker's knee showed no signs of swelling, effusion, increased warmth or localized tenderness. (R. at 102.) Dr. Jewell noted that Honaker's surgical incisions were well-healed and stated that the examination of her knee was "quite benign." (R. at 102.) At this time, Dr. Jewell concluded that Honaker had maximized her rehabilitation and was eligible to return to full work without restrictions. (R. at

-30-

102.)  Dr. Jewell allowed Honaker to continue taking her anti-inflammatory medication and encouraged her to work on her exercises. (R. at 102.)

On February 11, 2002, Honaker underwent a treadmill stress test at Clinch Valley Medical Center. (R. at 341-42.)  The test revealed abnormal EKG reading during the treadmill testing, normal stress myocardial perfusion imaging and normal gated SPECT imaging. (R. at 341.)  Dr. Jose M. Pariz, M.D., noted that the findings were consistent with an abnormal EKG response to exercise, but noted a possible false negative given no evidence of any ischemia or prior myocardial infarction and overall good exercise tolerance. (R. at 341.)

On February 12, 2002, Honaker returned to Dr. Chaudhry complaining of shortness of breath and difficulty breathing. (R. at 197.)  Honaker noted that she had been experiencing mild chest tightness with a smothering sensation and panic attacks. (R. at 197.)  Dr. Chaudhry noted that Honaker had a prescription for Zoloft but had not been taking it. (R. at 197.)  A physical exam revealed bilateral expiratory rhonchi and a pulse oximetry test revealed 98 percent saturation on room air. (R. at 197.)  Dr. Chaudhry's assessment was dyspnea, chest pain and depression. (R. at 197.)  Dr. Chaudhry prescribed Zoloft and instructed Honaker to return for a follow-up exam. (R. at 197.)

On March 12, 2002, Honaker returned to Dr. Chaudhry complaining of stiffness in her hips and hand joints. (R. at 195.)  A physical exam was unremarkable except for bilateral hip tenderness. (R. at 195.)  Dr. Chaudhry's assessment was hip bursitis, osteoarthritis and COPD. (R. at 195.)  Dr. Chaudhry prescribed Vioximetryx

-31-

for Honaker's pain and referred her to Dr. Joseph Claustro, M.D., for evaluation of her possible carpal tunnel syndrome. (R. at 195.)

On March 24, 2002, Honaker was admitted to Clinch Valley Medical Center after experiencing numbness of the face and right eye pain. (R. at 249-58.) No symptoms were noted and a physical exam was unremarkable. (R. at 251-52.) Honaker's diagnosis upon admittance was acute right hemiparestheia, possible transient ischemic event, migraine headaches, uncontrolled hypothyroidis, osteoarthritis, hyperlipidemia, menopause and mild hypertension. (R. at 249.) A two-view chest x-ray showed no significant cardiopulmonary abnormalities, and a CT scan of the brain was negative without contrast. (R. at 250.) Cardiac markers were normal and a carotid duplex study was negative for stenosis. (R. at 250.) An MRI scan of the brain revealed no significant abnormalities, and an MRA study of the intracranial vessels was normal. (R. at 250.) No evidence of venous sinus thrombosis was noted and a 2-D echocardiogram was normal. (R. at 250.) Honaker was discharged on March 28, 2002, because she was asymptomatic of any right hemiparesthesia or any focal motor, sensory or cranial nerve deficits. (R. at 249-50.) Dr. Chaudhry prescribed Synthroid, Depakote, Estratest HS, Tyloximetry, Singulair, Advair and Zoloft and was advised Honaker to follow a low cholesterol diet. (R. at 250.)

On April 11, 2002, Honaker returned to Dr. Chaudhry for a follow-up to her recent hospitalization. (R. at 194.) Honaker noted that her migraines were doing better but stated that her low back pain had been getting worse. (R. at 194.) Dr. Chaudhry noted that Honaker had a history of hyperlipidemia but was not following

a low cholesterol diet. (R. at 194.) A physical exam revealed adequate airways with some scattered rhonchi and a mild paravertebral muscle spasm. (R. at 194.) Dr. Chaudhry diagnosed Honaker with LS strain with low back pain, hyperlipidemia, diet controlled diabetes mellitus, chronic migraine headaches and COPD. (R. at 194.) Dr. Chaudhry ordered a lipid panel to be drawn and continued Honaker's prescriptions for Lipitor and Zoloft. (R. at 194.) Finally, Honaker was instructed to use a heating pad and a transcutaneous electrical nerve stimulation, ("TENS"), unit for her lower back pain. (R. at 194.)

On April 29, 2002, Honaker returned to Dr. Chaudhry complaining of dizziness and numbness of the face. (R. at 193.) Dr. Chaudhry noted that Honaker seemed to have a questionable history of thoracic inlet syndrome with the possibility of cervical rib pressing on the circulation to the brain. (R. at 193.) Dr. Chaudhry noted that recent MRI scans revealed evidence of some old ischemic areas in the white matter of the brain. (R. at 193.) Dr. Chaudhry further noted that an MRI of the brain was unremarkable for any circulatory blockage. (R. at 193.) A physical exam was unremarkable and Dr. Chaudhry diagnosed possible transient ischemic attack, chronic bronchitis, hypothyroidis and chronic migraine headaches. (R. at 193.) Dr. Chaudhry increased Honaker's dosage of Depakote and ordered TSH and ESR tests. (R. at 193.)

On April 30, 2002, Honaker returned to AOA complaining of continued pain in her right knee. (R. at 101.) Honaker noted that she had not worked since her last visit due to the pain. (R. at 101.) Honaker claimed that the pain was increased with weight bearing. (R. at 101.) A physical exam was unremarkable, and Dr. Jewell again concluded that she was eligible to return to work without restrictions. (R. at 101.)

-33-

On May 31, 2002, Honaker underwent a procedure to release the median nerve in her left hand. (R. at 259.) Dr. Joseph C. Claustro, M.D., noted that Honaker had undergone a nerve conduction test which revealed median nerve compression bilaterally. (R. at 259.) Honaker received a prescription for Lortab and was instructed to elevate the hand and to reapply the Ace bandage if it became too tight. (R. at 259.) Honaker was told to return in one week for removal of the stitches. (R. at 259.)

On July 9, 2002, Honaker saw Dr. German Iosif, M.D., of the Virginia Department of Rehabilitative Services for a disability determination. (R. at 260-76.) Dr. Iosif noted that Honaker presented with a main medical history of asthma and bronchitis. (R. at 260.) A review of Honaker's symptoms revealed occasional stiffness of the lower back but no chronic pain and occasional aching discomfort in her right knee but no persistent pain or gait impairments. (R. at 261.) Dr. Iosif noted that Honaker's back pain had responded to the use of a TENS unit and was not clearly precipitated by any factors or circumstances. (R. at 261.) A physical exam revealed normal functioning, and x-rays of Honaker's right knee, lumbar spine and chest were unremarkable. (R. at 261-63.) An electrocardiogram revealed sinus rhythm with no specific ST segment abnormality and spirometries were obtained with findings of minimal obstructive ventilatory defect. (R. at 263.) Dr. Iosif's impressions were chronic bronchitis with minimal features of COPD but no significant respiratory functional impairment, possibly bronchiectasis, and hyperlipidemia/ hypothyroidism/anxiety syndrome. (R. at 263.) Dr. Iosif concluded that he was not able to identify any clinically relevant functional impairments of a physical or psychiatric nature. (R. at 263.)

-34-

On August 13, 2002, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment form regarding Honaker's impairments. (R. at 278-85.) After reviewing the records, Dr. Johnson concluded that Honaker could occasionally lift items weighing up to 50 pounds, could frequently lift items weighing up to 25 pounds, could stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday and was unlimited in the ability to push and/or pull. (R. at 279.) Dr. Johnson further determined that Honaker had no postural, manipulative, visual, communicative or environmental limitations. (R. at 280-82.) Finally, Dr. Johnson concluded that Honaker's symptoms were partially credible and that she was not precluded from performing all levels of work. (R. at 283.) Dr. Johnson's findings were affirmed on January 21, 2003, and again on February 13, 2003. (R. at 284, 302-03.)

On August 30, 2002, Honaker returned to Dr. Chaudhry complaining of low back pain. (R. at 191.) A physical exam revealed paravertebral muscle spasm of the LS spine and a pulse oximetry test revealed 94 percent on room air. (R. at 191.) Dr. Chaudhry's assessment was acute LS strain, possible bronchiectasis, hypothyroidism and hyperlipidemia. (R. at 191.) Dr. Chauadhry orded a lipid panel and TSH to be drawn and prescribed Vioxx and Synthroid. (R. at 191.) Dr. Chaudhry further instructed Honaker to continue using the TENS unit and taking Lipitor, Advair and Bidex. (R. at 191.)

On September 13, 2002, Honaker returned to Dr. Chaudhry complaining of cough, congestion, production of phlegm, headaches and blurred vision. (R. at 190.) A physical exam revealed adequate air entry bilaterally with few scattered rhonchi.

-35-

(R. at 190.) Dr. Chaudhry diagnosed Honaker with acute bronchitis, dyspnea and chronic migraine headaches and increased her dosage of Depakote. (R. at 190.)

On October 8, 2002, Honaker was seen at Mountain Empire Neurological Associates for evaluation of her seizures and mini strokes. (R. at 320-21.) Except for mild peripheral neuropathy, a physical examination was unremarkable. (R. at 321.) Dr. Earl K. Wilson, M.D.'s, impression was possible seizure spells. (R. at 321.) Dr. Wilson stated that he hoped that Honaker would improve on seizure specific medication and noted that he would check her Depakote level to make sure she was at maximum therapy. (R. at 321.)

On October 21, 2002, Honaker returned to Dr. Chaudhry complaining of dyspnea and allergy symptoms. (R. at 188.) A physical exam revealed conjunctival congestion and bilateral expiratory rhonchi. (R. at 188.) Dr. Chaudhry's assement was hyperkalemia, dyspnea and allergic rhinitis. (R. at 188.) Dr. Chaudhry went on to note that Honaker had not shown any signs of hyperkalemia and that her symptoms could be secondary to hemolysis. (R. at 188.) Dr. Chaudhry ordered a CMP test and continued Honaker's prescription for Claritin. (R. at 188.)

On November 5, 2002, Honaker returned to Dr. Wilson for a follow-up exam. (R. at 319.) Honaker stated that she had not had a clear syncopal episode since her last visit in October. (R. at 319.) Honaker did note, however, that she still experienced numbness on the left side of her face and tongue. (R. at 319.) Honaker stated that it usually occurred once or twice a week and would last from several seconds to 10 minutes each time. (R. at 319.) A physical examination was normal,

and Dr. Wilson substituted Tegretol for Honaker's prescription for Depakote. (R. at 319.)

On November 11, 2002, Honaker returned to Dr. Chuadhry's office regarding her elevated blood sugar level. (R. at 186.) Marta Prupas, F.N.P., noted that a BMP drawn on October 21, 2002, was negative for hyperkalemia. (R. at 186.) A physical exam revealed occasional bilateral expiratory rhonchi and a pulse oximetry test revealed 96 percent saturation on room air. (R. at 186.) Prupas's assessment was diabetes mellitus type II, dyspnea and hyperkalemia. (R. at 186.) Prupas drew a hemoglobin A1C to evaluate Honaker's diabetes and instructed her on the need for proper diet and exercise. (R. at 186.) Prupas prescribed Glucophage and instructed Honaker to return in two weeks for fasting lipid and liver panels. (R. at 186.)

On November 18, 2002, Honaker returned to Dr. Chaudhry's office regarding her underlying breathing impairments. (R. at 184.) Honaker noted that she had been taking her breathing treatments two to three times per day and that her lungs were feeling better. (R. at 184.) A physical exam was unremarkable and a pulse oximetry test revealed 96 percent saturation on room air. (R. at 184.) Prupas's assessment was dyspnea, diabetes mellitus type II and hyperlipidemia. (R. at 184.) Prupas instructed Honaker to continue with her breathing treatments and to increase her dosage of Glucophage and Lipitor. (R. at 184.)

On January 16, 2003, R. J. Milan Jr., Ph.D., a state agency psychologist, completed a Psychiatric Review Technique Form, ("PRTF"), regarding Honaker's impairments. (R. at 286-301.) In this form, Milan concluded that Honaker had a

-37-

nonsevere affective disorder, depression, and other coexisting nonmental impairments that required referral to another medical specialty. (R. at 286, 289.) Milan determined that Honaker's impairments did not limit her activities of daily living, nor did they cause difficulties in maintaining social functioning, concentration, persistence or pace. (R. at 296.) Milan further determined that Honaker had not experienced any episodes of decompensation. (R. at 296.) Finally, Milan concluded that the evidence did not establish the presence of any "C" criteria factors. (R. at 297.)

On January 20, 2003, Honaker returned to Dr. Chaudhry's office regarding her diabetes. (R. at 181.) Prupas noted that Honaker had not been taking her prescription for Amaryl. (R. at 181.) A physical exam was unremarkable, and Prupas's assessment was diabetes mellitus type II, history of COPD and hypothyroidism. (R. at 181.) Honaker was instructed to continue her diet and to take her prescription for Amaryl. (R. at 181.)

On January 22, 2003, Honaker returned to Dr. Wilson for a follow-up exam. (R. at 318.) Honaker stated that the number of numbness spells that she experienced had decreased in frequency, but she now was having trouble with her concentration and memory. (R. at 318.) A physical exam was unremarkable, and Dr. Wilson's impressions were improved spells and forgetfulness, which he theorized was a product of her stressful situation. (R. at 318.) Dr. Wilson continued Honaker's medication and scheduled her for a follow-up exam in six months. (R. at 318.)

On February 18, 2003, Honaker returned to Dr. Chaudhry's office complaining of a pulsating pain in her right ear and episodes of hearing loss. (R. at 179.) A

physical exam revealed erythema and fluid around the right TM and fluid around the left TM. (R. at 179.) Prupas's assessment was right otitis media, rhinitis and borderline hypertension. (R. at 179.) Prupas prescribed Honaker Levaquin and gave her samples of Zyrtec D and Clarinex. (R. at 179.)

On March 14, 2003, Honaker returned to Dr. Chaudhry's office complaining cough, rhinitis and chronic right knee osteoarthritis. (R. at 178.) Honaker reported that her blood-sugar level had been running between 40 and 80 in the evenings and between 106 and 146 in the mornings. (R. at 178.) No other symptoms were reported. (R. at 178.) Upon physical examination, Prupas noted that Honaker coughed and had clear nasal drainage and occasional rhonchi without wheezing or crackling. (R. at 178.) Prupas noted tenderness in Honaker's right knee upon flexion. (R. at 178.) Otherwise, however, Honaker's knee exhibited good range of motion. (R. at 178.) Prupas's assessment was cough, rhinitis, borderline hypertension, chronic right knee osteoarhritis, hypothyroidism and hypertriglyceridemia. (R. at 178.) Prupas gave Honaker samples of Bidex DM and Zyrtec D, continued her Synthroid prescription and told her to return as needed. (R. at 178.)

On March 21, 2003, Honaker returned to Dr. Chaudry's office on complaints of cough and congestion. (R. at 317.) Honaker denied experiencing episodes of fever, chills, nausea, diaphoresis, neck stiffness, diarrhea and constipation. (R. at 317.) Other than her history of diabetes, hyperlipidemia and hypertension, a review of Honaker's symptoms was unremarkable. (R. at 317.) A physical exam revealed dull TMs, maxillary tenderness, light yellow nasal drainage, a slightly congested throat and occasional rhonchi in the lungs. (R. at 317.) Prupas assessment was pharyngitis,

-39-

sinusitis, cough, rhinitis, hyperlipidemia, diabetes mellitus type II and borderline hypertension. (R. at 317.) Prupas drew a complete blood count and fasting lipid panel and instructed Honaker to increase her dosage of Lipitor. (R. at 317.) Prupas advised Honaker to diet and to increase her level of physical activity. (R. at 317.) Prupas further instructed Honaker to discontinue using Albuterol and prescribed Levaquin, Bidex and a lidocaine viscous solution. (R. at 317.)

On April 3, 2003, Honaker saw B. Wayne Lanthorn, Ph.D., for a psychological evaluation. (R. at 304-14.) During a mental status evaluation, Lanthorn noted that Honaker arrived on time and was neatly dressed and groomed. (R. at 305.) Lanthorn noted that Honaker was alert and oriented to person, place, time and circumstance, and that she appeared free of thought disorder and delusional thinking. (R. at 305.) Honaker stated that she had never experienced hallucianctions. (R. at 305.) In addition to the mental status evaluation, Honaker was administered three tests; the Wechsler Adult Intelligence Scale - Third Edition, ("WAIS-III"), the Pain Patient Profile, ("P/3"), and the Personality Assessment Inventory, ("PAI"). (R. at 305.) First, Honaker's WAIS-III results placed her in the low average range of current intellectual functioning. (R. at 308.) Lanthorn noted that there was a slight difference in Honaker's verbal IQ over her performance IQ, and that this often signaled a marked degree of tension and anxiety as well as possible depression. (R. at 309.)

Next, Lanthorn noted that Honaker generated a valid PAI profile. (R. at 309.) Lanthorn noted that Honaker's profile was usually associated with individuals who were experiencing marked distress and severe impairment in their functioning. (R. at 309.) Lanthorne further noted that Honaker's degree of somatic concern suggested